Edward P. Moriarity
MORIARITY BADARUDDIN & BOOKE
736 South Third Street West
Missoula, Montana 59801
406-728-6868
406-728-7722 Fax
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF MONTANA

BUTTE DIVISION

| | |
|---|---|
| BRIAN KOPEIKIN, M.D.,<br><br>Plaintiff,<br><br>vs.<br><br>MOONLIGHT BASIN MANAGEMENT, LLC, D/B/A MOONLIGHT BASIN RESORT,<br><br>Defendants. | Case No.: CV-13-45-BU-DCL<br><br>**COMPLAINT AND JURY DEMAND** |

BRIAN KOPEIKIN, M.D., through counsel, for his causes of action, alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff Brian Kopeikin, M.D., is a board-certified anesthesiologist who resides in Santa Barbara, California and is a citizen of the state of California.

2. On information and belief, Plaintiff alleges that Defendant Moonlight Basin Management, LLC (hereinafter "Moonlight Basin"), is a Montana limited liability company whose principal office address is 56 Edwards Village Boulevard

1

# 201, Edwards, Colorado 81632-0000, and that Defendant Moonlight Basin was doing business as Moonlight Basin (ski) Resort in Madison County, Montana at all times relevant hereto.

3. Defendant Moonlight Basin's principal place of business is Montana and the center of its business activities is Montana, therefore, Defendant Moonlight Basin is a citizen of Montana for jurisdictional purposes.

4. This court has jurisdiction of the claims made in this matter under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Dr. Kopeikin and Defendant Moonlight Basin and the amount in controversy greatly exceeds $75,000.

5. Venue is proper in the Butte Division of the United States District Court for the District of Montana under 28 U.S.C. § 1391(b)(1) and (2), because Defendant Moonlight Basin resides in Montana and because the acts and omissions giving rise to the claim made herein occurred in Madison County, Montana and within the Butte Division of the United States District Court for the District of Montana.

## FACTS COMMON TO ALL CAUSES OF ACTION

6. On February 5, 2012, Dr. Kopeikin, then age 49, was an invited guest of Defendant Moonlight Basin and was skiing with a friend, Dr. Sven Rose, on premises owned, managed, altered, maintained, created and/or controlled by Defendant Moonlight Basin.

7. The conditions on February 5, 2012, were desirable for skiing; the snow was powder, visibility was clear, the wind was calm, and the temperature was between zero and thirty-two degrees Fahrenheit.

8. Dr. Kopeikin is a very experienced skier.

9. After lunch, Dr. Kopeikin and Dr. Rose boarded the Six Shooter chairlift at the Madison Village Base Area.

10. Upon exiting the Six Shooter chair, Dr. Kopeikin and Dr. Rose

considered riding the Headwaters chair to access expert terrain in the Stillwater Bowl area of Moonlight Basin.

11. However, Dr. Kopeikin and Dr. Rose thought that the terrain in the Stillwater Bowl area looked challenging and rocky so they decided to "take it easy" and, instead, opted to take an intermediate run called "Fast Lane," which accessed "Upper Elkhorn," a slightly more difficult run.

12. At approximately 1:11 p.m., Dr. Kopeikin and Dr. Rose were skiing down "Upper Elkhorn," with Dr. Rose slightly downhill and to skier's left of Dr. Kopeikin. Both skiers were traveling well under control and at medium speed.

13. "Upper Elkhorn" crosses an unnamed cat track that was not a naturally occurring or natural condition on the mountain; that was cut into the mountain by Defendant Moonlight Basin; that altered the natural surface and subsurface condition of the mountain; that was maintained in its artificial condition by Defendant Moonlight Basin; and that was not otherwise a natural surface or subsurface condition.

14. At the point where the cat track crossed the "Upper Elkhorn" run, the cat track was cut and maintained by Defendant Moonlight basin in such a configuration that the downhill edge of the cat track was higher than the uphill edge of the cat track, causing the cat track to slope downward in the uphill direction. This also was not a natural surface or subsurface condition, as depicted by the photograph attached hereto as Exhibit 1 and incorporated herein by this reference.

15. Both edges or boundaries of the cat track were lined with boulders that were imported to those locations, and were not natural surface or subsurface conditions. Rather, the boulders appear to have been placed alongside the cat track to delineate the path of the cat track.

16. Beginning at the downhill edge of the cat track, and continuing for a distance of approximately 50 feet downhill of the cat track, is a boulder field

comprised of large, craggy and sharp rocks.

17. The boulder field appears to have been created by the construction and/or grading of the cat track.

18. In addition, it appears that boulders placed on the downhill edge of the cat track migrated downhill and came to a rest in the boulder field, and within the "Upper Elkhorn" run.

19. The position and slope of the man-made cat track prevented skiers uphill of the cat track from having a sightline to the terrain immediately downhill of the cat track, thereby preventing skiers from seeing hazards present immediately downhill of the cat track.

20. There were no warning signs, poles, fences or devices of any kind at or above the cat track that gave notice of the cat track, nor advice or information to skiers on "Upper Elkhorn" that a boulder field lay immediately below the cat track, or that any hazardous condition or danger of any type existed immediately below the cat track.

21. As Dr. Kopeikin crossed the cat track, he saw, for the first time, and with no time or opportunity to take evasive action, the boulder field in the "Upper Elkhorn" run immediately below the cat track.

22. To avoid head injury, Dr. Kopeikin tucked his shoulder, rolled, and landed on his back in the rocks, sustaining multiple, severe, life-threatening, disabling and permanent injuries that are described in greater detail below.

23. Defendant Moonlight Basin ski patrol arrived at the scene and transported Dr. Kopeikin by ski gurney downhill, where he was taken by ambulance to Bozeman Deaconess Hospital.

24. Dr. Kopeikin was admitted to the intensive care unit at Bozeman Deaconess Hospital, and was an in-patient for eleven days. Doctors at Deaconess Hospital diagnosed the following injuries:

    a. Eleven fractured ribs, left side, ribs three through twelve;

      b.     Flail chest;

      c.     Left shoulder acromial fracture;

      d.     Left shoulder coracoid base fracture with intra-articular extension;

      e.     Left shoulder loose bodies with labral tearing and glenohumeral arthritis;

      f.     Hemothorax;

      g.     Laceration of the spleen;

      h.     Multiple lacerations, contusions and abrasions.

25. Dr. Kopeikin experienced severe pain and substantial difficulty with his injuries during his hospital course. Among other complications, Dr. Kopeikin suffered from renal insufficiency while hospitalized and became septic, which required placement of a long term IV access device through a vein in his arm and into his heart, followed by six weeks of IV antibiotic therapy.

26. By the eleventh post-trauma day, Dr. Kopeikin's condition had stabilized sufficiently that he was discharged to be taken home to California for further care.

27. In the months following Dr. Kopeikin's release from the hospital, he required continuous care to manage his injuries. On or about February 22, 2012, Dr. Kopeikin required Thoracentesis to remove 700cc of blood from his chest, which rapidly re-accumulated due to ongoing internal bleeding. On or about April 24th, 2012, he began an extremely painful course of physical therapy in an attempt to mobilize, and to restore the use of, his injured chest, shoulder and arm. However, Dr. Kopeikin suffered complete non-union of his multiple scapular fractures and was forced to undergo surgery.

28. On October 4, 2012, Dr. Kopeikin underwent the following surgical procedures to repair his scapula and shoulder.

      a.     Left shoulder open reduction internal fixation of acromion base

fracture;

b. Left shoulder open reduction internal fixation of coracoid base fracture;

c. Left shoulder arthroscopic glenohumeral debridement of damaged cartilage and removal of loose bodies.

d. Excision of distal clavicle.

29. Despite the physical, medical, and surgical treatments and therapies, Dr. Kopeikin has not recovered and will not recover from his injuries; and Dr. Kopeikin will require further surgery, including one or more total shoulder replacements during his lifetime.

30. Dr. Kopeikin continues to experience significant physical pain as a direct and proximate result of the injuries he sustained at Defendant Moonlight Basin.

31. As the direct and proximate result of his injuries, Dr. Kopeikin has been unable to work as an anesthesiologist, which has caused and continues to cause additional and substantial psychological pain and suffering, and great personal and professional anxiety, in addition to the pain, suffering and anxiety caused by his physical injuries.

32. As the direct and proximate result of his inability to work as an anesthesiologist, Dr. Kopeikin has suffered a loss of professional income of at least $600,000 to date; he will suffer a lifetime loss of professional income of at least $8,000,000; he will suffer a loss of earning capacity; he has incurred medical expenses in the approximate amount of $90,000.00 to date; and he will incur future medical expenses in an amount that is still to be determined.

## FIRST CLAIM FOR RELIEF:
## GROSS NEGLIGENCE AND NEGLIGENCE: PREMISES LIABILITY

33. Dr. Kopeikin incorporates by reference the preceding paragraphs the same as though fully set forth herein.

34. At all times relevant hereto, Defendant Moonlight Basin and its agents and employees owed a duty to all persons invited to and paying for the use of Defendant's premises, including Dr. Kopeikin, to exercise reasonable care to construct, maintain and operate the premises in a reasonably safe condition and reasonably safe manner, free from hidden, undiscoverable, unidentified, unmarked, unbarricaded and unwarned of hazards, such as the unreasonable and unexpected hazard created by the cat track and the visually-obstructed boulders described above.

35. The hazards created by the cat track and obstructed boulder field were man-made and were not a natural surface or sub-surface condition.

36. Defendant's acts and omissions in breach of its duties include, without limitation, the initial design, construction and creation of the unreasonable hazard; the method of cutting and maintaining the cat track; the ongoing maintenance of the cat track and adjacent area in a hazardous configuration and condition; the failure to inspect the premises for unreasonable hazard; the failure to mark and mitigate the unreasonable hazard; and the failure to place barriers, or to provide notice or warning of the unreasonable hazard.

37. By virtue of their continuous physical presence on the Upper Elkhorn run, Defendant had actual and constructive notice and knowledge of the nature and severity of the hazard prior to the time of Dr. Kopeikin's injuries and damages.

38. The hazard was of such a nature and severity, and existed for such a period of time, that the Defendant, in the exercise of ordinary care as a ski resort operator, should have recognized and mitigated the hazard before it caused injury to Dr. Kopeikin.

39. Defendant's acts and omissions proximately caused the injuries and damages that Dr. Kopeikin has suffered, and that he will continue to suffer, for the remainder of his life.

40. As the direct and proximate result of these breaches of duty by Defendant Moonlight Basin, Dr. Kopeikin has sustained serious and permanent physical and psychological injuries, and has sustained, and will sustain, special and general damages in amounts that far exceed the jurisdictional limits of this Court, as more particularly described below in the section of this complaint entitled "Damages."

## SECOND CLAIM FOR RELIEF:
## NEGLIGENT HIRING, TRAINING, SUPERVISION AND MANAGEMENT

41. Plaintiff incorporates by reference the preceding paragraphs the same as though fully set forth herein.

42. Defendant Moonlight Basin owed a duty to all persons invited to and paying for the use of Defendant's premises, including Dr. Kopeikin, to act reasonably in hiring, training, directing, instructing, supervising and managing its agents, representatives and employees, to ensure that such agents knew how to design, construct, create, maintain and operate a reasonably safe premises to provide a reasonably safe skiing experience for patrons using Defendant's ski area.

43. By its acts and omissions described above, Defendant Moonlight Basin breached these duties in that it failed to hire, train, direct, instruct, supervise and manage its agents so as to avoid designing, constructing, maintaining the hazard that caused injury to Dr. Kopeikin.

44. By its acts and omissions described above, Defendant Moonlight Basin breached these duties in that it failed to ensure that its agents had adequate skills, and used their skills, to recognize and mitigate and/or warn of, or place barriers at, hazards such as that which injured Dr. Kopeikin.

45. As the direct and proximate result of these breaches of duty, Dr. Kopeikin has sustained serious and permanent physical and psychological injuries, and he has sustained and will sustain special and general damages in amounts that

far exceed the jurisdictional limits of this Court, as more particularly described below in the section of this complaint entitled "Damages."

## DAMAGES

44. Plaintiff incorporates by reference the preceding paragraphs the same as though fully set forth herein.

45. As a direct and proximate result of the acts and omissions of Defendant Moonlight Basin, Dr. Kopeikin has suffered severe and permanent personal injuries, resulting in special and general damages including, but not limited to, the following:

    a. Past medical expenses in the approximate amount of $90,000.00.

    b. Future medical expenses in an amount to be determined and to be proved at the trial of this case;

    c. Lost income in the approximate amount of $600,000;

    d. Future lost income in the amount of at least $8,000,000;

    e. Past loss of earning capacity in an amount to be proved at trial;

    f. Future loss of earning capacity in an amount to be proved at trial;

    g. Past physical pain and suffering in an amount to be proved at trial;

    h. Future physical pain and suffering in an amount to be proved at trial;

    i. Past emotional pain and suffering in an amount to be proved at trial;

    j. Future emotional pain and suffering in an amount to be proved at trial;

    k. Past physical and functional disability in an amount to be proved at trial;

    l. Future physical and functional disability in an amount to be proved at trial;

    m. Past physical disfigurement in an amount to be proved at trial;

    n. Future physical disfigurement in an amount to be proved at trial;

    o. Past and future loss of enjoyment of life in an amount to be proved at trial;

1     p.    Other past special damages in an amount to be proved at trial;

2     q.    Other future special damages in an amount to be proved at trial;

3     r.    Other past general damages in an amount to be proved at trial;

4     s.    Other future general damages in an amount to be proved at trial.

46. Prior to the injuries and damages suffered by Dr. Kopeikin, Defendant and its agents, representatives and employees had actual knowledge and notice of the hazard that caused Dr. Kopeikin's injuries and damages, by virtue of at least the following facts: (a) the design, construction, creation, maintenance and operation of the cat track, (b) the obstructed line of sight from above the cat track to the area immediately below the cat track caused by the location and slope of cat track, (c) the presence of the boulder field immediately below the cat track, and (d) the absence of barriers or warnings at or above the cat track, such that Defendants created a high probability of injury to Dr. Kopeikin and others similarly situated; yet, Defendants deliberately operated and continued to operate the "Upper Elkhorn" run, in that hazardous condition, in conscious and/or intentional disregard of the high probability of injury to Dr. Kopeikin and others similarly situated.

47. Alternatively, Defendants, and each of them intentionally disregarded the facts concerning the hazard created by (a) the design, construction, creation, maintenance and operation of the cat track, (b) the obstructed line of sight from above the cat track to the area immediately below the cat track caused by the location and slope of cat track, (c) the presence of the boulder field immediately below the cat track, and (d) the absence of barriers or warnings at or above the cat track, such that Defendants created a high probability of injury to Dr. Kopeikin and others similarly situated, but deliberately operated and continued to operate the "Upper Elkhorn" run, in that hazardous condition, in deliberate indifference to the high probability of injury to Dr. Kopeikin and others similarly situated.

48. Based on their conscious and/or intentional disregard and/or deliberate indifference to the high probability of injury to Dr. Kopeikin and others similarly

situated, an award of punitive and exemplary damages is proper to deter these defendants, and others similarly situated, from future similar misconduct.

**WHEREFORE**, Plaintiff respectfully prays that the Court enter judgment against Defendants, and each of them, as follows:

    a.    For such general damages, past and future, as Dr. Kopeikin shall prove himself entitled at the trial of this case;

    b.    For such special damages, past and future, as Dr. Kopeikin shall prove himself entitled at the trial of this case;

    c.    For an award of punitive and exemplary damages; and

    d.    For such other and further relief as the Court deems just and equitable under the circumstances.

DATED this 12th day of June 2013.

/s/ Edward Moriarity
Edward P. Moriarity
MORIARITY BADARUDDIN & BOOKE
736 South Third Street West
Missoula, Montana 59801
406-728-6868
406-728-7722 Fax
*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff, through counsel, respectfully demands a jury trial of all issues herein and submits the requisite fee herewith.

DATED this 12th day of June 2013.

/s/ Edward Moriarity
Edward P. Moriarity
736 South Third Street West
Missoula, Montana 59801
406-728-6868
406-728-7722 Fax
*Attorneys for Plaintiff*

Summer Road